IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUAN GUEVARA,<br><br>        Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,<br><br>        Defendant. | MEMORANDUM DECISION and REPORT & RECOMMENDATION<br><br>Case No: 2:07-CV-835 TS<br><br>District Judge Ted Stewart<br><br>Magistrate Judge David Nuffer |

Plaintiff Juan Guevara seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.[1] Under 28 U.S.C. § 636(b)(1)(B), District Judge Ted Stewart referred[2] this case to the Magistrate Judge for a report and recommendation on all dispositive issues.

**Background**

Mr. Guevara filed DIB and SSI applications on May 5, 2004, alleging onset of his disabling condition as of September 13, 2001.[3] The applications were denied initially and upon reconsideration.[4] Guevara timely requested a hearing before an Administrative Law Judge (ALJ)

---

[1] 42 U.S.C. §§ 401-433, 1381-83f.

[2] Order of Reference, docket no. 6, filed 1/28/2008.

[3] R. 54-59, 211-13.

[4] R. 38-39; 44-46; 49-51.

which was held in Salt Lake City, Utah, on September 7, 2006.[5] Plaintiff Guevara, his daughter and a vocational expert (VE) testified at the hearing.[6] The ALJ issued a decision on January 24, 2007, finding Guevara not disabled.[7] Guevara filed a timely request for review by the Appeals Council[8] which was denied,[9] making the ALJ's decision the Commissioner's final decision for purposes of judicial review.[10]

Guevara was 44 years old as of his alleged onset date and 50 years old on the date of the ALJ's decision.[11] He has a high school education and past work experience as a building maintenance worker and cleaner of commercial buildings.[12] For several years prior to the alleged onset date, Guevara underwent treatment in California by the Lakeside Medical Group and later, the Alonso Medical Group.[13] These records indicate that Guevara was often treated for diabetes mellitus and diabetic neuropathy previously diagnosed in 1993.[14]

Beginning in July 2001, Guevara began presenting with leg and knee pain[15] and

---

[5] R. 231-80.

[6] *Id.*

[7] R. 16-22.

[8] R. 10-12.

[9] R. 4-7.

[10] *See* 20 C.F.R. §§ 404.981, 416.1481.

[11] R. 38-39, 54, 211.

[12] R. 60-64, 79-86, 240-46, 275.

[13] R. 102-20 (treatment records from 8/13/97 - 9/6/01).

[14] R. 115-19 (noting patient diabetic for 5 years).

[15] R. 105-07.

underwent a neurological consultation by Kanwal Nayyar, M.D. in October 2001.[16] Dr. Nayyar diagnosed peripheral neuropathy secondary to diabetes mellitus.[17] Guevara continued treatment for diabetes and neuropathy with Alonso Medical Group through June 2002.[18] On June 11, 2002, L.V. Alonzo, M.D., completed a Request for Medical Information for Guevara's private disability insurer. He stated that Guevara had diabetes and neuropathy, which were treated with pain killers and insulin, and that Guevara would be able to resume his regular work by December 11, 2002.[19]

In February 2003, Guevara began seeing David Gontrum, M.D., to establish care and follow-up treatment for diabetes.[20] Upon examination, Dr. Gontrum diagnosed poorly controlled diabetes mellitus, diabetic neuropathy, and hypertension. He continued Guevara on the previously prescribed medications: Humulin (brand of insulin), Amitriptyline (an anti-depressant) and Neurontin.[21] The record indicates that Guevara continued to see Dr. Gontrum for treatment on a regular basis from February 2003 through July 2007.[22] Almost all of the visits document poorly controlled diabetes mellitus, and Guevara's failure to follow the prescribed

---

[16]R. 88-89.

[17]R. 89.

[18]R. 90-101.

[19]R. 103-04.

[20]R. 137.

[21]*Id.*

[22]R. 123-46; 153-61; 191-98; 201-10; 214.

treatment to control his blood sugar levels.[23]

In August 2006, Dr. Gontrum completed a medical report,[24] wherein he noted that Guevara suffers from diabetes, hypertension, osteoarthritis, back pain from osteoarthritis, and diabetic neuropathy. His symptoms include constant back pain, burning pain in his hands and feet constantly, numbness in his feet and hands, with decreased sensation in his feet. Dr. Gontrum noted that there was no improvement expected, and that there would be gradual worsening of symptoms, but that work on a regular and continuous basis would not cause the patient's condition to deteriorate. He opined that the claimant could sit for a total of eight hours in an eight-hour workday; that he could stand and walk a total of four hours in an eight-hour workday; that he could lift and carry no more than 20 pounds on a regular basis; and that he could only occasionally bend, squat, climb, or reach. Dr. Gontrum further opined that the claimant's pain was severe enough to frequently interfere with the attention and concentration necessary to perform even simple work tasks. Dr. Gontrum noted that Guevara could not sustain use of his hands for fine manipulation. Finally, Dr. Gontrum noted that the claimant would only be able to perform approximately 4-5 hours of work in a typical workday, depending on the level of exertion required for the job.[25]

Based on a referral by Dr. Gontrum, Guevara saw Ken Libre, M.D. at least annually from 2003 through 2005 for a diabetic eye exam.[26] At each visit, Dr. Libre diagnosed Guevara with

---

[23] R. 127-28; 130; 135; 137; 155; 197; 202-03; 205; 208; 210; 214.

[24] R. 191-94.

[25] *Id.*

[26] R. 121; 132; 199-200; 207.

diabetic retinopathy and continued patient counseling on the need for better blood sugar control.[27]

Dr. Gontrum also referred Guevara to Stephanie Boade Silas, M.D. for a rheumatology evaluation in July 2005 due to hand, ankle and knee stiffness.[28] Dr. Silas diagnosed polyarthritis primarily involving his hands, ankles, and knees; evidence for osteoarthritis with Heberden's and Bouchard's; and trigger fingers with nodularity over the tendon on the volar surface of his hands. She considered the possibility of inflammatory disease, but did not detect rheumatoid arthritis. She felt that Guevara's poorly controlled diabetes could be contributing as it has been found to be associated with tautness of the of the fingers. Dr. Silas found no range of motion restriction, but suggested that Guevara's tendon thickening and tendency to trigger fingers could be related to his poor diabetes control. She encouraged him to work on obtaining tighter blood sugar control and recommended a trial of an anti-inflammatory, Naprosyn.[29]

In October 2004, Guevara underwent a psychological evaluation by Dr. Jonathan J. Ririe, Ph.D.[30] After the examination, Dr. Ririe diagnosed Guevara with mood disorder due to diabetes and arthritis, with major depressive features. He recommended a psychiatric consultation to evaluate effectiveness of the antidepressant (prozac) that Guevara was currently taking, and participation in counseling.[31]

The first state agency review in August 2004, recommended that Guevara could do light

---

[27]*Id.*

[28]R. 157-61.

[29]*Id.*

[30]R. 147-51.

[31]*Id.*

work, which was affirmed in August 2004 by state agency physician Dr. Taggart[32] who also completed a Residual Functional Capacity form that same month.[33] An updated agency review was completed in October 2004 with the same recommendation of light work.[34] This report was affirmed again by Dr. Taggart and state agency psychiatrist Glen Tong[35] after he completed a Psychiatric Review Technique form.[36] A third state agency report was updated in December 2004 and continued to recommend that Guevara could perform light work.[37] This recommendation was again affirmed by a state agency physician.[38]

## Analysis

### 1. Claim of depression

Guevara first agues that at step two of the familiar five-step sequential evaluation process the ALJ improperly rejected his claim of depression as groundless.[39] During the step two analysis, the ALJ considered all the evidence and found Guevara had the severe impairments of

---

[32]R. 162-63.

[33]R. 182-89.

[34]R. 164-65.

[35]R. 165.

[36]R. 168-81.

[37]R. 166-67.

[38]*Id.*

[39]*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The regulations require the Commissioner to consider, in sequence: (1) whether the claimant is working; (2) whether the claimant has a "severe" impairment; (3) whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listings), and is, thus, presumptively disabled; (4) whether the claimant can perform past relevant work; and (5) whether the impairments prevent the claimant from doing any other kind of work.

diabetes mellitus, diabetic neuropathy, diabetic retinopathy and osteoarthritis.[40] The ALJ reviewed Guevara's description of his daily activities;[41] the consultative examination by Dr. Ririe;[42] the Psychiatric Review Technique form by Dr. Tong;[43] and Guevara's own testimony that he never sought treatment from a mental health professional and does not take any medication for depression.[44] All of this evidence clearly supports the ALJ's finding "that while the claimant suffers from a medically determinable mental impairment, such impairment causes no more than mild mental limitations and is thus not a severe mental impairment"[45] that would significantly limit his ability to perform basic work activity.[46]

### 2. Opinion of treating physician and hearing testimony

Guevara next claims that the ALJ improperly rejected the opinions of his treating physician, Guevara's hearing testimony and the hearing testimony of his daughter.

#### A. Opinion of treating physician

It is well settled that an ALJ reviewing the opinions of treating sources must engage in a sequential analysis.[47] First, the ALJ must consider whether the opinion is supported by medically

---

[40]R. 18-19.

[41]R. 264-68.

[42]R. 147-51.

[43]R. 165-81.

[44]R. 261.

[45]R. 19.

[46]*See Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).

[47]*Watkins v. Barnhart,* 350 F.3d 1297, 1300 (10th Cir. 2003).

acceptable clinical and laboratory diagnostic techniques, and is consistent with other substantial evidence in the record.[48] If these conditions are not met, the treating physician's opinion is not entitled to controlling weight.[49]

But even if it is determined that the opinion is not entitled to controlling weight, that does not mean that the opinion should be rejected.

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.[50]

The regulatory factors that must be considered are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[51]

Therefore, the ALJ's decision must show that these factors were considered in calculating the weight of the opinion and provide "good reasons" for the weight ultimately assigned to the

---

[48] *Id.*; Social Security Ruling (SSR) 96-2p; 20 C.F.R. § 404.1527(d).

[49] *Watkins,* 350 F.3d at 1300.

[50] *Id.* (quoting SSR 96-2p).

[51] *Id.* at 1301 (quoting *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001).

opinion.[52]

In this case, the ALJ did not, as Guevara suggests, completely reject the opinions of treating physician Dr. Gontrum. The ALJ stated he rejected one facet of Dr. Gontrum's opinion:

> The undersigned generally accepts the opinion of Dr. Gauntrum [sic] to the degree that it indicates that the claimant is able to perform light work. The undersigned specifically does not accept Dr. Gauntrum's [sic] opinion with regard to the claimant's inability to maintain concentration. Such degree of inability is not found in the medical evidence and is not even supported by the claimant's testimony. The claimant is not being treated for any mental condition. He is not attending a pain clinic. The claimant is able to carryout most activities of daily living up to a light exertional level. He is able to drive a car. Dr. Ririe's report did not suggest that the claimant suffered from limitation [of] concentration or memory (exhibit 4F).[53]

In disregarding the Dr. Gontrum's view of Guevara's ability to concentrate, the ALJ relied heavily on Guevara's own testimony that the pain did not interfere with his concentration.[54]

As outlined above, the ALJ did not give the treating physician's opinion controlling weight because it was inconsistent with his own treatment notes,[55] inconsistent with other medical evidence in the record,[56] and inconsistent with Guevara's lack of mental health

---

[52] *Watkins*, 350 F.3d at 1300 -01; 20 C.F.R. § 404.1527(d)(2).

[53] R. 20.

[54] R. 270-271.

[55] *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (treating physician's opinion rejected when unsupported by office notes).

[56] *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (ALJ may consider other medical opinion evidence in rejecting the opinion of a treating physician).

treatment.[57]

Yet, the ALJ did give some weight to the opinion after considering all medical opinions in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927.[58] He considered the degree to which Dr. Gontrum's opinion was supported by the relevant evidence and its consistency with the record as a whole.[59] He also considered other factors which tended to support or contradict Dr. Gontrum's opinion, including Guevara's lack of mental health treatment and activities of daily living.[60] An ALJ is not required to provide a formalistic recitation of the factors described in 20 C.F.R. §§ 404.1527(d), 416.927(d).[61] Here, the ALJ provided "good reasons" for the weight he ultimately gave Dr. Gontrum's opinions.

### B. Hearing testimony

Guevara argues that both he and his daughter testified that he had significant problems with concentration and memory, and that the ALJ improperly rejected this hearing testimony without providing any justification.

Because an ALJ is in the best position to observe the demeanor of witnesses at a hearing, the ALJ's credibility findings are given special deference.[62] The ALJ only needs to set forth the

---

[57] *See Castellano*, 26 F.3d at 1029 (claimant's limited use of pain medications inconsistent with treating physician's opinion that claimant's pain was totally disabling).

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Pisciotta v. Astrue*, 500 F.3d 1074, 1077-80 (10th Cir. 2007).

[62] *See Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3D 1195, 1201 (10th Cir. 2004).

specific evidence he relies on in evaluating a claimant's credibility.[63] In this case, the ALJ stated: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonable be expected to produce the alleged symptoms, but that the claimants's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[64] This finding is supported by the record evidence showing that Guevara's subjective complaints were inconsistent with the medical findings.[65] The ALJ also noted that the lack of treatment for the allegedly disabling mental impairments undermined Guevara's credibility on that issue.[66] Guevara's own conflicting testimony created a credibility issue when he stated that the pain did not interfere with his concentration.[67]

The brief testimony of Guevara's daughter stating that Guevara was forgetful and his hands appeared deformed[68] was simply redundant and cumulative of Guevara's own testimony - which the ALJ had already considered and found "not entirely credible."[69] Consequently, reassessing repetitive testimony that had already been deemed less than helpful, would not have any affect on the ALJ's decision.

---

[63]*See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[64]R. 20.

[65]R. 88-89 (Dr. Nayyar found Guevara had full motor strength, normal sensation and intact coordination); R. 125, 131, 133-34 (Dr. Gontrum noted no abnormal physical findings); R. 147-51 (Dr. Ririe's report did not indicate the same degree of mental symptoms alleged).

[66]R. 19-20. *See Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (lack of medical treatment to obtain relief may be considered in credibility assessment).

[67]R. 270-71.

[68]R. 272-73.

[69]R. 20.

### 3. ALJ's burden at step five

After considering the entire record, the ALJ determined that Guevara could not return to his past relevant work, all of which required medium exertion,[70] but that he did possess the residual functional capacity (RFC) to perform a limited range of light work.[71] Therefore, at this step five analysis, the burden shifted to the ALJ to identify specific jobs existing in substantial numbers in the national economy that Guevara could perform despite the identified limitations. To make this determination, the ALJ asked the vocational expert (VE) to assume a hypothetical individual of Plaintiff's age, and with his education and work experience, who was limited to light work that did not require forceful grasping and only occasional fingering, along with the need to alternate sitting and standing at will and standing for an hour.[72] The vocational expert testified that such an individual could perform the job of school bus monitor (20,000 jobs in the national economy), counter clerk (9,450 jobs in the national economy) and call out operator (82,000 jobs in national economy).[73] The ALJ relied upon the VE's testimony to find that Guevara could perform a significant number of jobs in the national economy with his current limitations,[74] and therefore, he was not disabled.

Guevara claims that the ALJ's hypothetical questions to the vocational expert were incomplete and defective because they did not include his inability to concentrate due to pain and

---

[70] R. 21.

[71] R. 19-21.

[72] R. 276-77.

[73] R. 277-78.

[74] *See Jensen v. Barnhart*, 436 F.3d 1163, 1168 (10th Cir. 2005); *Qualls,* 206 F.3d at 1373.

other depressive symptoms. As previously discussed, however, the ALJ's finding that Guevara did not have severe mental impairments was supported by substantial record evidence. Guevara also argues that the ALJ erred by not including a requirement in the hypothetical that he needed to lie down during the day. None of the medical records indicate a medical need for Guevara to lie down during the day. This was simply Guevara's subjective statement contained in Dr. Gontrum's treatment notes when Guevara reported that he napped or tried to lie down during the day.[75] Because Guevara's claimed need to lie down during the day was not supported by the record, the ALJ had no obligation to include that impairment in the hypothetical posed to the VE.[76] Consequently, in this case, the hypothetical questions the ALJ asked the VE "provided a proper basis for the ALJ's disability decision."[77]

## Recommendation

For the reasons outlined above, the Magistrate Judge recommends that the District Judge affirm ALJ's decision in is matter because it is supported by substantial evidence and is free of legal error.

## Notice

Within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections. A party may respond to another party's objections within 10 days after being served with a copy thereof. The rules provide that the

---

[75] R. 134, 196.

[76] *See Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.1987).

[77] *Qualls,* 206 F.3d at 1373.

district judge to whom the case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject or modify the recommended decision, receive further evidence, or re-commit the matter to the magistrate judge with instructions. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

February 23, 2010.

BY THE COURT:

_____
David Nuffer
U.S. Magistrate Judge